WhitakeR, Judge,
delivered the opinion of the court:
This case is before the court on defendant’s motion and plaintiff’s cross-motion for summary judgment.
On May 31,1956, plaintiff, a veteran preference eligible in the classified civil service, was discharged from his position in the Military Sea Transportation Service, with forfeiture of all pay and allowances, including accrued leave from January 16,1956.[1] The charge against plaintiff was that he had deserted his ship, the USNS Short Splice, on January 20, 1956, while it was docked at the United States Naval Operating Base, Bermuda. After a review on the merits, both the Military Sea Transportation Service (MSTS) and the Civil Service Commission, to which plaintiff appealed, sustained the charge.
Plaintiff now sues in this court for the salary he would have received if he had not been discharged, claiming that the actions of the employing agency and the Civil Service Commission were arbitrary and capricious or their decisions were so erroneous as to imply bad faith, since, it is alleged, there was no substantial evidence before either of them to sustain the charge of desertion.
The record before this court contains all the evidence before the Civil Service Commission and the Military Sea Transportation Service. The relevant facts of the case may *3 be briefly stated as follows: Plaintiff was employed as the First Assistant Engineer on the USNS Short Splice. On the evening of January 19, 1956, while in the Chief Petty Officers’ Club at the Bermuda Naval Station, plaintiff and one Benbow, who was a Wiper on the Short Splice and one of plaintiff’s subordinate employees, got into an altercation, during which Benbow hit plaintiff on the side of the head. Immediately thereafter, Benbow left the Club. Plaintiff followed after him, but was unable to overtake him. Plaintiff then returned to the ship.
When Benbow returned to the ship about 1:00 a.m. plaintiff sought him out and found him in his room aboard the Short Splice. A second disagreement took place, during which Benbow struck plaintiff in the face, while plaintiff’s arms were being held by the Second Mate and others in an attempt to stop the fight. Eventually, plaintiff was pushed and crowded to his cabin by the Chief Mate and the Second Mate.
In his affidavit made on January 23,1956 plaintiff reports the following colloquy which took place at this time between him and the First and Second Mates:
* * * I told them both that if they think they can run the Engine Department I would pack my gear and get off. The Second Mate told me he did not care what I did, but he would not let me go to the Wiper’s room. I told them at least three times, but they would not let me alone; consequently I started packing. * * * The mates were so sure I would not do such a foolish thing that no one tried to stop me from leaving. * * *
Duprey, the Chief Mate and a friend of plaintiff’s, testified concerning this incident:
I told Mr. Guiness to cahn down & stop making a fool of himself. He said that he didn’t care & was getting off the ship. I told him that he would be a deserter & make it bad for everyone. He said that he wasn’t taking orders from any mates. He asked for a suitcase. With the idea that the gesture might calm him down, I let him have one of my suitcases. He packed his gear. _ I told him to sleep on his decision before leaving the ship. I left him in his room at about 0200 to let him think it out. All told, I was trying to talk him into acting sensibly from about 2330 to 0200.
*4 After leaving the ship, plaintiff went to a nearby hotel. After getting a room, he telephoned the Chief Engineer. Plaintiff gives the following report of this conversation in his affidavit of January 23:
I called the Chief Engineer to inform him that the captain wanted the ballast tanks filled in the morning and that I did not want to sail on a ship where a Wiper can punch a First Assistant Engineer. He told me I would get into trouble, that I was acting too hastily, and the least I should do is remain aboard until the ship arrived in New York.
The Chief Engineer relates this conversation as follows:
1. On 20 January 1956 at about 0230 1st Asst. Engr. C. Guiness telephoned me on board ship. I was just returning to the ship from liberty.
2. Mr. Guiness informed me that the Master wanted the ballast pumped in in the morning. He told me that he was in some fight with the Wiper & had gotten a black eye. He said, “I’ve got my bags with me & am staying-up here at the hotel.” He said, “I’m not coming back.” I said, “After 14 years of service, you’d be a fool to quit that way.” I talked to him for about 20 minutes telling him over and over again to come back to the ship. He refused to come back. He said that he had already gotten his reservation on the 0900 plane to N. Y. I told him that he could get his money back & sail with the ship.
The next morning, January 20, 1956, plaintiff awoke at 9:00 o’clock and, after seeking medical care for his swollen eye, took an afternoon plane to New York. The Short Splice sailed that morning at 10:00 o’clock for Norfolk. Soon after his arrival in New York plaintiff reported the foregoing events to officials at the Military Sea Transportation Service headquarters in New York.
On February 3, 1956, he was charged with desertion, and later, on May 31, 1956, he was dismissed from the service and his pay and personal effects left on board were forfeited.
In plaintiff’s contract of employment he agreed to be bound by the Civilian Marine Personnel Instructions and all duly authorized regulations. Section 6 of Civilian Marine Personnel Instruction No. 45, which is the regulation of the employing agency on which the charges were based, defines *5 desertion as “the quitting of a ship and her services without leave and with the intent not again to return to the ship’s duties.” Paragraph 6-2 further requires that “the intent to desert be established by a preponderance of the evidence.” Plaintiff bases his argument solely on the ground that the evidence did not establish the necessary intent to sustain the charge of desertion. He says this is true because there is evidence in the record that when he left the ship he left certain items of clothing behind, and, secondly, that as soon as possible after his arrival in New York he reported to the agency headquarters, related what had taken place, and asked their advice on what to do. However, irrespective of this, we have in evidence plaintiff’s own affidavit and testimony that he told the Chief Engineer that he was quitting the ship, and his statement to the First and Second Mates that he was leaving the ship, and the further fact that he packed a suitcase with at least some of his personal effects, and left the ship with them. His affidavit is corroborated and elaborated by the First Mate and Chief Engineer. We also have the further fact that when plaintiff awoke the next morning he made no effort to rejoin his ship, although it did not leave until an hour later.
Plaintiff says when he arrived in New York he asked permission to rejoin his ship in Norfolk, but none of the five officials of the service in New York have any recollection of such a request having been made.
In the light of all this evidence, it is clear that the employing agency was not arbitrary or capricious in determining that plaintiff did have the intent to desert his ship.
We call attention to the fact that plaintiff was not charged with deserting the service, but with deserting his ship. We quote a passage from the opinion of the Supreme Court in Robertson v. Baldwin, 165 U.S. 275, 282-283:
From the earliest historical period the contract of the sailor has been treated as an exceptional one, and involving, to a certain extent, the surrender of his personal liberty during the life of the contract. Indeed, the business of navigation could scarcely be carried on without some guaranty, beyond the ordinary civil remedies upon contract, that the sailor will not desert the ship at a critical moment, or leave her at some place where sea *6 men are impossible to be obtained — as Molloy forcibly expresses it, “to rot in her neglected brine.” Such desertion might involve a long delay of the vessel while the master is seeking another crew, an abandonment of the voyage, and, in some cases, the safety of the ship itself.
It is not our function to substitute our judgment for that of the employing agency or the Civil Service Commission. Our review is limited to the sole question of whether their action was reasonable in the light of all the evidence. Blackmon v. United States, 128 C. Cls. 288; Bayly v. United States, 99 C. Cls. 598. We have no doubt that it was entirely reasonable. Plaintiff, of course, acted in anger, but even after he had “slept over it,” he still made no effort to rejoin his ship, but abandoned it and left it to get to Norfolk as best it could, without the services of one of the most important officers in charge of the operation of a ship, to wit, the First Assistant Engineer.
Plaintiff’s motion is denied. Defendant’s motion for summary judgment is granted, and plaintiff’s petition is dismissed.
It is so ordered.
Barksdale, District Judge, sitting by designation; Laea-moee, Judge, and Madden, Judge, concur.

 This was in accordance with R.S. § 4596, 30 Stat. 760 (1898), as amended, 53 Stat. 1147 (1939), 46 U.S.C. § 701 (1952), which provides, in pertinent part:
Whenever any seaman who has been lawfully engaged or any apprentice to the sea service commits any of the following offenses, he shall be punished as follows:
First. For desertion, by forfeiture of all or any part of the clothes or effects he leaves on board and of all or any part of the wages or emoluments which he has then earned.