Pee Curiam:
This case was referred to Trial Commissioner Paul H. McMurray with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on December 10, 1965. Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the rules of the court has expired. On January .14, 1966, defendant filed a motion that the court adopt the report. Since the court agrees with the trial commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judg *1112 ment in. this case without oral argument. Plaintiff is, therefore, not entitled to recover and the petition is dismissed.
OPINION OK THE COMMISSIONER*
McMurray, Commissioner: Plaintiff was employed as an Electric Power Systems Dispatcher (hereafter referred to as Power Dispatcher) at the Public Works Center of the United States Naval Base, Newport, Bhode Island, (hereafter referred to as Naval Base), from 1950 to 1960. In that capacity he coordinated the electrical currents between the power grid at the Naval Base and the electrical system for the adjacent town of Newport. Should a malfunction occur in the system at the Naval Base the Power Dispatcher would dispatch a line-crew supervisor to the trouble area and after isolating the work area by rerouting the electrical current around the repair site the line crew could work in safety.
Plaintiff had the further responsibility of responding to requests for electrical appliance repair service by occupants of Government quarters on the Naval Base. A complaint of this nature would be evaluated by the Power Dispatcher to determine the nature of the problem before he dispatched a properly qualified repairman to the caller’s quarters. The position required an alert and able dispatcher on duty 24 hours a day. The position was filled by three Power Dispatchers, which included plaintiff, working in 8-hour shifts.
From December 13, 1959, through December 22, 1959, plaintiff was ill with a virus infection and at home on sick leave. He visited his family doctor before returning to his work and his only symptoms of the virus at the time of that visit were loose stools and general malaise. All other symptoms, such as dizziness, abdominal cramps and nausea, had disappeared within a period of 72 hours.
Plaintiff resumed his work shift (8 a.m. to 4 p.m.) on December 23, 1959. On December 24, 1959, he was relieved at 4 p.m., but said nothing to the Power Dispatcher who relieved him about being ill or otherwise unable to work. On December 25, 1959, a substitute Power Dispatcher telephoned plaintiff at 6:30 a.m. to inquire whether he would be *1113 well enough, to work that day. Plaintiff assured the caller that he felt all right and would report for duty.
Plaintiff ate no breakfast, but drank a jigger of ginger brandy, an alcoholic beverage, at approximately 5:45 a.m. and another one at 6:45 a.m., contending later that the brandy was prescribed by his physician, Dr. K. J. Compton, who had been plaintiff’s family physician for several years. Dr. Compton denied prescribing ginger brandy for plaintiff and further testified that ginger brandy might bring on dizziness. When plaintiff relieved the night Power Dispatcher on the morning of December 25th, he said nothing to the other employee about being ill.
At approximately 2:30 p.m. on Friday, December 25,1959, Colonel McBrayer, who resided on the Naval Base, called the Power Dispatcher to complain about his electric stove, but no one answered. On his second attempt, the telephone was answered by an individual whose speech was slow, garbled, incoherent and impossible to understand. After several minutes of attempted, but unsuccessful discourse, the answering individual indicated that no repair service would be available until the following Monday morning. That statement was erroneous as emergency service is always available at the Naval Base on holidays. McBrayer redialed the telephone and the same person answered. This time McBrayer could not understand anything which was said by the person who answered the call. Again he dialed the correct telephone number and again the same individual answered. After another call which was answered by the same individual, McBrayer called the operator who dialed the duty officer’s number at least twice and each time the person to whom McBrayer had previously spoken answered the call in the same unintelligible manner.
Plaintiff stated at a hearing that his false teeth had been removed at 11:30 a.m. and not replaced until a short time before he went home. McBrayer, who was familiar with the manner of speech of men who have lost their false teeth and also the way men sound when they are drunk, believed that the man who answered the telephone was intoxicated.
McBrayer reported his experience to Captain Bennett, the Commander of the Public Works Center, at approximately *1114 3 p.m. on Christmas Lay. Bennett immediately called the Power Dispatcher’s office. He was answered by a man whose speech was slurred and difficult to understand. Bennett asked for the duty officer expecting to be connected with the switchboard operator in the Power Dispatcher’s office. He was told that he would have to call another number. When his attempt to reach the duty officer through the other number was unsuccessful, Bennett redialed and spoke again to the same individual whose attempted conversation was unintelligible. After hanging up the receiver he checked with the telephone operator to see whether a malfunction was causing the other party to sound incoherent. The operator stated that there was no malfunctioning of the telephone. Bennett finally got through to the duty officer by calling his own office which was adjacent to that of the duty officer.
Lieutenant Grundy was the duty officer and Bennett told Grundy to go to the Power Dispatcher’s office. Grundy did so and found plaintiff on duty at the Power Dispatcher’s office. Plaintiff sat passively in his chair, his head nodding occasionally and his eyes closing. His speech, in response to Grundy’s questions, was incoherent. His coordination was poor, and he could not accurately point his finger to a log book entry which Grundy thought pertained to McBrayer’s call.
Grundy asked plaintiff if he had been drinking and plaintiff nodded his head affirmatively. Grundy then asked plaintiff when he had commenced drinking. Grundy received no reply to his question, but estimated that it must have taken plaintiff some time to have reached the condition he was in and, accordingly, he asked plaintiff whether he had commenced drinking around 2 p.m. on that date. Plaintiff again nodded his head in the affirmative. Grundy requested plaintiff to send an electrician to McBrayer’s quarters, but when plaintiff attempted to use the telephone he was unable to perform the physical action required to dial a telephone number. Shortly''*5 thereafter James Pearson, plaintiff’s relief dispatcher, came on duty and placed a call to the electrician.
Bennett arrived at the dispatcher’s office at approximately 4 p.m. and was told by Grundy that plaintiff had nodded his head affirmatively when questioned about drinking and *1115 whether such drinking had begun about 2 p.m. Plaintiff heard this report when it was made to Bennett and was aware of Bennett’s identity but offered no explanation for his condition. Both Bennett and Grundy believed that plaintiff was intoxicated at that time.
At approximately 5 p.m. on the same day, December 25, 1959, plaintiff’s general supervisor, Bowse W. Springer, was informed by Grundy that plaintiff had been found intoxicated while on duty. Springer spoke on the telephone with plaintiff 2 hours later and told him it was necessary to suspend him from further duty. Plaintiff replied, “I’m sorry I let you down,” and admitted he had a couple of drinks of liquor on the job from a bottle which a workman brought to his office.
Plaintiff made a return visit to Dr. Compton on the following day, December 26,1959, where he complained of abdominal cramps, dizziness of 2 days’ duration and intermittent loose stools. Dr. Compton testified that those symptoms could have been the result of a mild recurrence of the virus infection, or with respect to the cramps and dizziness, a result of intoxication.
When plaintiff met with Springer, Albert P. Boretti, the Industrial Belations Officer of the Base, and Bichard L. Mann, plaintiff’s immediate supervisor, plaintiff told Springer that he was ill on December 25th because he drank tainted eggnog from the Power Dispatcher’s icebox. Further questions elicited an acknowledgement by plaintiff that he did, in fact, drink liquor while on duty and the eggnog story was an attempt to protect the workman who had brought the liquor to plaintiff.
■ Although Springer offered to intervene on behalf of plaintiff if he would accept a demotion to the grade of electrician, plaintiff chose instead to contest removal from his position of Power Dispatcher. Plaintiff never told Springer that his condition on the 25th was due to a recurrence of a virus infection rather than intoxication.
On January 27, 1960, a hearing was'held by an Advisory Hearing Board at the Public Works Center, United States Naval Base. Plaintiff testified he was ill when he left his home on December 25,1959, and became progressively worse *1116 during the day. He was in the bathroom on two occasions in the afternoon when a heating mechanic, Joseph Simmons, answered the telephone in the Power Dispatcher’s office. Simmons testified at the trial that he answered two telephone calls in the Power Dispatcher’s office. Plaintiff testified that he drank nothing while on duty and never told Springer anything to the contrary. The Advisory Hearing Board found that plaintiff consumed an alcoholic beverage while on duty, December 25, 1959.
On appeal to the First United States Civil Service Eegion, which conducted an independent investigation, the decision by the Advisory Hearing Board was confirmed on June 10, 1960.
Plaintiff filed a timely appeal with the Board of Appeals and Review of the United States Civil Service Commission. That Board affirmed the decision of the First Regional Office of the Civil Service Commission. Thereafter, plaintiff filed a petition in this court for money damages.
Based upon the record as a whole[1] it appears established by the testimony of many responsible and disinterested witnesses that plaintiff was intoxicated while on duty. Uncon-troverted evidence described plaintiff’s incoherent speech and appearance which also tended to corroborate the conclusion arrived at by the employing agency and the Civil Service Commission with respect to intoxication. Plaintiff admitted to his supervisor by telephone and subsequently, in the presence of other individuals, that he had consumed liquor while on duty. In an effort to overcome the probity of evidence against him, plaintiff has insisted that he was seriously ill on December 25, 1959, with a recurrence of a virus from which he suffered prior to the 25th. He also denied having consumed any alcoholic beverage subsequent to the early morning drinks of ginger brandy which he had before reporting for duty on December 25, 1959.
This court has previously handed down decisions which deal with the question of substantial evidence. The court’s review of action taken by an administrative agency is often *1117 limited to the issue as to whether such action was arbitrary or capricious or not supported by substantial evidence. The court stated in Bayly v. United States, 99 Ct. Cl. 598, 605 (1943) :
* * * the reviewing court does not make a new and independent determination of the facts. It only examines the record which the administrative body had before it, to ascertain whether there was substantial evidence to support the findings made by that body, or whether there was some denial of a fair hearing. We see no reason why our review of the findings of the Civil Service Commission, which has been entrusted by Congress with the task of making the initial determination of the facts, should be different. We therefore examine the evidence and the proceedings before the Civil Service Commission, but only for the purpose of ascertaining whether that body had before it substantial evidence to support its determination * * *.
See also Blackmon v. United States, 128 Ct. Cl. 288, 291, 120 F. Supp. 774, 775-76 (1954), where this court stated:
* * * As to the merits of a Government employee’s dismissal, we do not review them, unless there is a showing of malicious or arbitrary action by the Government department which dismissed the employee. See Gadsden v. United States, 111 C. Cls. 487 [78 F. Supp. 126]; Levy v. United States, 118 C. Cls. 106. * * *
In Guiness v. United States, 149 Ct. Cl. 1, 6 (1960) cert. denied 363 U.S. 819, the court stated:
It is not our function to substitute our judgment for that of the employing agency or the Civil Service Commission. Our review is limited to the sole question of whether their action was reasonable in the light of all the evidence. * * *
The court also stated in Prater v. United States, 172 Ct. Cl. 608, 615 (1965).
It is not the province of this court to determine whether or not plaintiff committed the offense for which he was charged * * * in the removal action. The case is before the court based upon allegations that the removal action was arbitrary and capricious. These allegations must be clearly established to be sustained. Croghan v. United States, 116 Ct. Cl. 577, 89 F. Supp. 1002, cert. denied, 340 U.S. 854 (1950). * * *
*1118 The action of the administrative agency in dismissing plaintiff from federal service could have been handled on the basis of a judicial review to determine whether such action was arbitrary, capricious or not supported by substantial evidence. Neither party moved to proceed in that manner.[2] Defendant filed a motion for summary judgment which was denied by the court. The case was then returned to the commissioner for further proceedings.- A formal trial was held and the parties were given full opportunity to offer proof which included documentary evidence and the testimony of many witnesses.[3]
Based upon a review'of the complete record which includes evidence considered by the Public Works Center and the Civil Service Commission, plus the proof offered at the trial, it is concluded that plaintiff has failed to meet his burden of proof. The administrative determinations were not arbitrary or capricious, but were supported by substantial evidence.
Plaintiff is not entitled to recover and his petition should be dismissed.
FINDINGS on Fact
1. This is a claim for money damages based upon plaintiff’s removal from his position as an Electric Power Systems Dispatcher (hereafter referred to as Power Dispatcher) on February 26,1960, because it was determined by the employing agency, the Public Works Center of the United States Naval Base, Newport, Rhode Island (hereafter referred to as Naval Base), that he was intoxicated or under the influence of intoxicants on duty December 25,1959.
2. Plaintiff is a veteran preference eligible, and was employed by the Public Works Center under a career appointment in the competitive service.
3. Plaintiff exhausted his administrative remedies in obtaining reviews of his case by (1) the Public Works Center, (2) the First United States Regional Office of the Civil Service Commission, and (3) the Board of Appeals and Review of the Civil Service Commission. In filing suit in this *1119 court on May 15, 1962, plaintiff alleged that the agencies which considered his case “acted in an arbitrary and capricious manner in removing the petitioner from his position and grade of Electric Power Systems Dispatcher * *
4. Defendant filed a motion for summary judgment on June 11, 1963. The motion was argued before the court and submitted on February 4, 1964. On February 14, 1964, an order was issued by the court which denied defendant’s motion for summary judgment, without prejudice, and returned the case to the trial commissioner for further proceedings.
5. A pretrial conference was convened on April 24, 1964, followed by three formal trial sessions during which many witnesses were heard and numerous exhibits entered in the record.
6. Plaintiff was well qualified to perform the position to which he was assigned and his record of performance on the job for 10 years had been entirely satisfactory, prior to the incident which resulted in his removal. No adverse comment or criticism of his work had been entered in his personnel file prior to December 25, 1959. The job description of the position of Electric Power Systems Dispatcher states that the person occupying such position would control the operation of a power system. The description of the position includes the following:
7.Occupation Requirements
* ❖ ¡Ü $ *
b. Responsibility * * *.
* ❖ * * ❖
Maximum damage possible would be caused by improper paralleling or switching, which could residt in serious physical injury or fatality to workers and might cause monetary damage to generators or boilers amounting to $500,000. More likely to occur are damage to oil circuit breakers costing $15,000 and weakening of submarine cable by closing on a fault where repair cost would usually amount to $2,000 to $5,000. Delays in restoring service to distribution areas supplying industrial-type activities could result in considerable man-hour and other loss. Is responsible for correctness of data and computations required in billing power charges to activities. Is responsible for sending line men to scene of any fire on Base property.
*1120 c. Physical Demands
Sits at table in front of Dispatcher’s Board, stands, and walks about Dispatcher’s Boom to observe and operate supervisory control apparatus, confers by phone or two-way radio and makes changes on Dispatchers [sic] Board. Degree of physical exertion is light. Mental alertness is required in a high degree because of the speed with which emergencies can develop in power systems and the constant danger to personnel and expensive equipment, if certain details are neglected in switching or paralleling operations.
‡ * * ❖ *
7. The Power Dispatcher has control over a multimillion dollar, 22,000 volt electrical system. He is one of the most important employees in the electrical transmission system at the Naval Base, and is responsible for coordinating the interchange arrangement between the electrical generating system of the Naval Base and the generating system of the adjacent city of Newport. Under that arrangement, the Power Dispatcher controls the flow of electricity generated by the Naval Base into the town’s electrical system during the peak period of the town. Conversely, electricity generated by the town flows into the electrical system of the Naval Base during its peak period. It is exceedingly important that the Power Dispatcher be alert at all times.
8. When there are malfunctions in the Navy’s electrical system, the Power Dispatcher is normally the first person notified, and he dispatches the supervisor of the line crew to the trouble area. When the line crew determines the nature of the trouble a call is made to the Power Dispatcher and he directs the switching which is necessary in order to isolate a portion of the electrical system from the flow of current so that the line crew may safely work in the isolated area. The Power Dispatcher should always have full control of his faculties when on duty. The men in the field depend on the Dispatcher for their safety and must rely on the fact that he has given the proper switching orders to make certain that the portion of the line upon which they are working is entirely safe.
9. In addition to controlling the electrical power system, the Power Dispatcher has a secondary assignment of receiv *1121 ing trouble calls from individuals occupying Government quarters on the Naval Base who seek maintenance service for electrical appliances. The Power Dispatcher would normally determine the nature of the problem and dispatch the proper type of repairman to the caller’s quarters.
In some instances when a simple maintenance problem is involved, the Power Dispatcher may attempt to instruct the caller as to corrective action which should be taken. On holidays, if a repairman of the type needed is not on duty, the Power Dispatcher can obtain maintenance service by calling in an off-duty repairman.
10. The Power Dispatcher performs his work from the Power Dispatcher’s office which is located on the ground floor of the Public Works Center. There are many dials and switches in that office which relay information to him with respect to the condition of the electrical system which enables him to direct and control switching operations which may be necessary. Two floors above the Power Dispatcher is the office of the duty officer. The telephone of the duty officer is an extension off a switchboard located in the Power Dispatcher’s office. Telephone calls to the duty officer ring in the Power Dispatcher’s office and he connects the caller with the duty officer.
11. During the period involved at least one Power Dispatcher was required to be on duty at the Public Works Center 24 hours a day. The five Power Dispatchers at the Public Works Center were rotated on 8-hour shifts with two Dispatchers on duty for the day shifts, except on holidays when each shift was performed by one Dispatcher.
12. Plaintiff was on sick leave from December 13, 1959, through December 22, 1959, because of a virus infection. Prior to returning to work on December 22,1959, he visited his physician, Dr. Compton, and at that time the only remaining symptoms of the virus were loose stools and general malaise. All the other symptoms of his virus, such as dizziness, abdominal cramps and nausea had disappeared. The symptoms of such condition usually disappear within 72 hours or a lesser period.
13. When plaintiff returned to work on December 23,1959, he was on a day shift which was from 8 a.m. to 4 p.m. *1122 When another Power Dispatcher relieved him at 4 p.m. on December 24, 1959, plaintiff made no statement about being ill.
14. Plaintiff was the Power Dispatcher previously scheduled to work the day shift on December 25, 1959. At 6:30 a.m. on the morning of December 25, 1959, the Power Dispatcher who would have had to work if plaintiff was ill telephoned plaintiff to inquire whether he would be working that day and plaintiff assured him that he felt all right and would be on duty that day.
When plaintiff relieved the night Power Dispatcher on the morning of December 25, 1959, he made no complaint about being ill.
15. Plaintiff did not eat breakfast prior to departing for work on the morning of December 25, 1959. He drank a jigger of ginger brandy, an alcoholic beverage, at approximately 5:45 a.m. and another at 6:45 a.m. During a trial session of this case at Newport, Rhode Island, plaintiff contended that the ginger brandy was a medication prescribed by Dr. Compton for virus infection. Dr. Compton testified that he never prescribed ginger brandy for his patients. It was the doctor’s opinion that ginger brandy would not alleviate nausea, but would intensify it and might bring on dizziness.
16. At approximately 2:30 p.m. on Friday, December 25, 1959, Colonel James D. McBrayer, a resident of Quarters 7 at the Naval Base, called the Power Dispatcher’s office to report that he was having trouble with his electric stove. He dialed the number listed in the Base telephone directory for repair service, which was the same as the telephone number of the Power Dispatcher’s office. After the telephone rang several times and no one answered, McBrayer called the operator to inquire whether the number listed in the telephone book was the proper number to call for emergency repairs. The operator verified the correctness of the number and McBrayer dialed it again. It rang for a long time and was finally answered by an individual whose speech was incoherent, slow, garbled and very difficult to understand. Because of the incoherent speech of the individual who answered the telephone, McBrayer spent several minutes *1123 trying to understand the person who bad answered tbe call. The gist of the individual’s conversation, insofar as McBrayer could understand, was that no service was available until Monday morning. Such a statement was not correct because maintenance service was available on holidays and would normally have been furnished on Christmas Day.
17. McBrayer had previously had a fire in his quarters from a stove which was not functioning properly and he was concerned about obtaining the needed service. He waited 10 minutes before calling again in the hope that during that time the individual to whom he had previously talked would have time to “collect his wits.” McBrayer redialed the number he had previously called and the phone was again answered by the same person whose speech was incoherent and disjointed as it was on the first call except that on this second occasion none of the sounds made by the individual who answered the call was understandable. McBrayer had been able to understand a few words of the earlier conversation. He then dialed the number listed in the Base telephone directory for the duty officer and the telephone was answered by the same person who had answered the previous calls and his voice was still incoherent. McBrayer hung up the receiver again and redialed the duty officer’s number. The telephone was answered by the same incoherent person to whom he had talked on the other calls. He then called the operator and she dialed the duty officer at least twice and each time the same individual to whom McBrayer had previously talked answered the call in a manner which was not understandable; an incoherent garbled-type voice.
At approximately 3 p.m. McBrayer telephoned Captain Bennett, a Naval officer who was Commander of the Public Works Center, and advised Bennett that his stove was not working and of the difficulty he had experienced in trying to contact the Power Dispatcher and the duty officer.
18. At the time of the trial McBrayer had been in the Marine Corps for a period of 25 years and he had talked with many men under his command who were intoxicated. While a prisoner of war in World War II he also had occasion to talk to individuals in the prison camp who had lost *1124 their false teeth. He was familiar with the manner in which an individual speaks when he is intoxicated and also when he has no teeth in his mouth. In his opinion, the individual who answered the telephone on the six occasions when he called the numbers listed for the Power Dispatcher and the duty officer on December 25, 1959, spoke as if he were intoxicated.[1]
19. After receiving McBrayer’s call, Bennett called the Power Dispatcher’s office and asked for the duty officer. The individual who - answered the telephone spoke in a slurred voice which was difficult for Bennett to understand. Although telephone connections with the duty officer’s phone were made through the switchboard in the Power Dispatcher’s office, the individual who answered Bennett’s call did not connect him with the duty officer but instead told him to call another number. When Bennett attempted to reach the duty officer through that number he was unsuccessful, so he again called the Power Dispatcher’s office. The same individual answered the second call and he spoke in the same unintelligible manner. Bennett then called the operator to ascertain whether his difficulty in understanding the Power Dispatcher could be attributable to a malfunction of the phone circuit. She informed him that the circuits were operating properly. He next telephoned his office which was adjacent to the duty officer’s office. The duty officer, Lieutenant Grundy, answered the telephone. After advising Grundy of the situation he had encountered, Bennett directed him to go to the Power Dispatcher’s office.
20. When Grundy entered the Power Dispatcher’s office after 3 p.m. on December 25, 1959, plaintiff was on duty at the Power Dispatcher’s desk. Grundy questioned him as to whether he had received a trouble call from Quarters 7, McBrayer’s quarters. Plaintiff’s response was not intelligible because his words were slurred and jumbled together. When Grundy had spoken to plaintiff on occasions prior to *1125 December 25, 1959, plaintiff’s speech was not slurred and he had no trouble understanding him.
21. During the 25 minutes that Grundy was in the Power Dispatcher’s office, plaintiff sat passively in his chair and occasionally his head would droop and his eyes would close. Grundy examined the Trouble Call Log required to be kept by the Power Dispatcher, but found no notation regarding McBrayer’s call. He saw an entry which he first thought might pertain to McBrayer’s call and he questioned plaintiff concerning it. Plaintiff attempted to point to the entry indicated by Grundy, but he was unable to coordinate his arms and hands sufficiently to point to that entry and instead, pointed to an entry several lines below the one to which Grundy had pointed.
Grundy asked plaintiff if he had been drinking. Plaintiff nodded his head in the affirmative. Grundy then asked plaintiff when he had commenced drinking. When he received no reply Grundy estimated that it must have taken plaintiff some time to have reached the condition he was in and so he asked plaintiff whether he had commenced drinking around 2 p.m., and plaintiff again nodded in the affirmative. Grundy then asked plaintiff to have an electrician sent to Quarters 7, but when plaintiff attempted to telephone the electrician he was unable to perform the necessary physical movements required to dial the telephone number. Shortly thereafter James Pearson, the Dispatcher who was to relieve plaintiff, came on duty and placed the call to the electrician.
22. At approximately 4 p.m. on December 25, 1959, Bennett arrived at the Power Dispatcher’s office. In the presence of plaintiff, Grundy informed Bennett that plaintiff had nodded affirmatively when questioned as to whether he had been drinking and whether such drinking had commenced about 2 p.m. Plaintiff had met Bennett on previous occasions and was aware of his identity, but he offered Bennett no explanation concerning his condition. Bennett examined the Trouble Call Log plaintiff was required to keep and noted that certain entries were missing and also that there *1126 was some almost illegible scribbling on the Log which, had been made by plaintiff.[2] Bennett also noted that there were several entries missing from the Power Dispatcher’s Daily Log Sheet, another form the Dispatcher was required to keep.
23. Approximately 10 minutes after Bennett arrived at the Power Dispatcher’s office plaintiff left that office. Although plaintiff had driven his car to work that morning, an employee of the shipyard who was in the same car pool drove plaintiff’s car and took him home at Bennett’s suggestion.
24. Prior to his service at Newport, Grundy had served on shore patrol and on many occasions had dealt with individuals who were intoxicated. During his career in the service Bennett had also observed and talked to people who were under the influence of intoxicants. Both of these officers were familiar with the appearance and actions of persons under the influence of intoxicants. Based on their observations of plaintiff on December 25, 1959, in the Power Dispatcher’s office, both were of the opinion that plaintiff was intoxicated when they saw him on that date.
25. Based upon his observation of plaintiff in the Power Dispatcher’s office on December 25, 1959, Pearson, the relief Dispatcher, did not know whether plaintiff was intoxicated and declined to express an opinion as to the cause of plaintiff’s condition. It was his opinion, however, that plaintiff’s condition was such that he was unable to perform the duties of a Power Dispatcher when seen by Pearson on the date mentioned.
26. About 5 p.m. on Christmas Day, 1959, Grundy called plaintiff’s top supervisor, Eowse W. Springer, who was in charge of Utilities at the Public Works Center, and advised him that Bennett had found plaintiff intoxicated on duty and unable to perform his job as Power Dispatcher. Springer returned to the Base from his home in Providence, *1127 Ehode Island. At approximately 7 p.m., after Bennett and Grundy had apprised him of the events which had transpired, Springer telephoned plaintiff. When plaintiff came to the telephone Springer informed him that in view of what had happened it would be necessary to suspend him from further duty. Plaintiff replied, “I’m sorry I let you down.” Springer then asked plaintiff whether he had anything to drink and plaintiff responded that he had a couple of drinks of liquor on the job from a bottle which a workman had brought to his office. Plaintiff did not tell Springer that he was ill or suffering from a recurrence of the virus condition while on duty. Springer told plaintiff to come to his office the following Monday morning, December 28, 1959.
27. On the morning of December 28, 1959, plaintiff met with Springer, Eichard L. Mann, his immediate supervisor, and Albert P. Boretti, the Industrial Eelations Officer for the Naval Base. When Springer asked plaintiff what happened while he was on duty December 25, 1959, plaintiff’s initial response what that he had become ill from drinking tainted eggnog that had been found in a refrigerator in the Power Dispatcher’s office. Since that statement was not in accord with what plaintiff had told Springer on the telephone in the evening of December 25th, Springer questioned plaintiff further. Plaintiff again stated that he had a couple of drinks of liquor while on duty on December 25th and admitted that his statement that he drank some eggnog was false and was made in an attempt to cover up and protect the workman who had brought the liquor to him.
28. At the meeting on December 28,1959, Springer advised plaintiff that disciplinary action would be requested. Springer informed plaintiff that he could not continue working as a Power Dispatcher while disciplinary action was pending, but could be placed on annual leave or remain on the rolls and continue to be paid as a Power Dispatcher while being actually assigned to some other job. Plaintiff decided to continue working, in a different job, pending conclusion of the disciplinary proceedings.
29. It was Springer’s opinion that plaintiff would have to be removed from the position of Power Dispatcher because *1128 of the nature of the duties of that position and the necessity that workmen have confidence in the Power Dispatcher. After plaintiff admitted that he had been drinking while on the job, Springer never seriously considered retaining him as a Power Dispatcher. At the meeting on December 28, 1959, and subsequently, Springer offered to intervene with the Commander of the Public Works Center on plaintiff’s behalf. In connection with that offer, plaintiff was informed that if he should request a demotion to a lower-level wage-board job Springer would seek to have such demotion serve as the full extent of disciplinary action. On both occasions plaintiff declined Springer’s offer of assistance. One job which Springer considered for plaintiff was that of an electrician inasmuch as plaintiff was a licensed electrician.
30. The schedule of disciplinary offenses and penalties set forth in the Navy Civilian Personnel Instructions in effect during the period pertinent to this action prescribed a range of penalties from a reprimand to a removal for a first offense of reporting for duty, or being on duty under the influence of intoxicants.
31. Plaintiff did not state to Springer on December 28, 1959, or at any time thereafter, that his condition while on duty on December 25, 1959, resulted from a recurrence of a virus infection rather than from intoxication.
32. On December 26,1959, plaintiff went to Dr. Compton’s office complaining of abdominal cramps, dizziness of 2 days’ duration and intermittent loose stools. It was the doctor’s opinion that those symptoms might have been caused by a mild recurrence of the virus condition. Plaintiff’s complaints were all subjective and the doctor stated at the trial that there is no way of determining whether there is a basis for such complaints. He admitted, however, that the dizziness and abdominal cramps could have resulted from being intoxicated or from a virus infection. The doctor also stated that he could not determine from an examination of plaintiff on December 26, 1959, whether plaintiff had been intoxicated the day before.
33. Captain S. C. Gill, the Acting Commanding Officer of the Public Works Center, notified plaintiff of his proposed *1129 removal by a letter dated January 11, 1960. The letter is quite lengthy and lists in great detail the events and circumstances which led to a charge against plaintiff of being under the influence of intoxicants while on duty and a decision to remove him from the position of Power Dispatcher effective February 19,1960. The letter concludes as follows:
# Hí
4. You are advised of your right to answer this charge personally and in writing and also to furnish affidavits m support of such reply. Further, you will be granted a hearmg, upon request, at which you may be represented by any two persons of your choice who may desire to represent you, and call upon witnesses who have direct knowledge of the circumstances and factors bearing on your case. _ Your reply, if one is made, or any request for a hearing, if one is desired, must be submitted to the Commanding Officer by not later than 19 January 1960.
5. During the thirty day notice period covered by this notice of proposed adverse action, you will be relieved of your duties as Power Dispatcher and will perform such duties as may be assigned by the Head, Utilities Department, or, if you desire, will be placed on annual leave at your written request.
34. Through a letter from his attorney dated January 15, 1960, plaintiff requested a hearing of the type described in the letter cited in the preceding finding. A hearing was conducted on January 27, 1960, and plaintiff and his attorney were present.
35. At the hearing Bennett, Grundy, Springer and Boretti testified as witnesses of the agency. Bennett’s testimony pertained to the call he had received from McBrayer on December 25,1959; his calls to the Power Dispatcher’s office; and the duty officer’s office on that day; and his meeting with Grundy in the Power Dispatcher’s office at 4 p.m. on December 25, 1959. Grundy’s testimony related to the call he had received from Bennett on December 25, 1959; his conversation with plaintiff in the Power Dispatcher’s office; and his discussions with Bennett when he arrived in that office. Springer testified concerning his discussion by telephone with plaintiff on the evening of December 25th; and the discus- *1130 sioh be bad with plaintiff in Springer’s office on December 28th. Boretti corroborated Springer’s testimony concerning the discussion with plaintiff on December 28, 1959.
36. At the agency hearing plaintiff testified that he was ill on December 25,1959, when he left home and became progressively worse. He denied receiving any telephone calls from Bennett or McBrayer and stated that on two occasions while he was in the bathroom Joseph Simmons, a heating mechanic who came to plaintiff’s office about 2:45 p.m. answered the telephone. He admitted having two drinks of brandy before leaving his home on December 25, 1959, but denied having any drinks subsequent to the time he left home on that date and denied that he had previously admitted to Springer that he had been drinking on Christmas Day while on duty.
3.7. Simmons, a witness for plaintiff at the trial stated that he went to the Power Dispatcher’s office on December 25, 1959, about 2 or 2:30 p.m. He answered the telephone on two occasions because plaintiff was in the men’s room. The Trouble Call Log maintained by plaintiff and introduced at the agency hearing indicates that Simmons was on a maintenance call from 2 until 3 p.m. on December 25, 1959.
38. At the conclusion of the hearing both plaintiff and his attorney advised the hearing board that they had “more than a fair hearing.”
39. On February 17,1960, a written notice of final decision to remove plaintiff from his position was issued to plaintiff from Captain S. C. Gill, the Acting Commanding Officer of the Public Works Center. The notice stated in pertinent part as follows:
% iji ‡
2. A personal hearing conducted by an Advisory Hearing Boai’d, convened by reference (c), and conducted in accordance with reference (d), was accorded you on 27 January 1960. After thorough review of the hearing record, it is the decision of this Command that the charge of being on duty under the influence of intoxicants is sustained. This decision is based on the following facts:
a. You were incapacitated for the proper performance of your duties on the afternoon of 25 December 1959 by reason of indulgence in alcoholic beverages.
*1131 b. This Command has no reason to dohbt the veracity of Lt. Grundy, Public Works Center Duty Officer, concerning your affirmative replies to the questions as to your drinking alcoholic beverages on the afternoon of 25 December 1959 while you were on duty.
c. The numerous discrepancies in the testimony of your principal witness, Mr. Simmons, cast doubt upon his veracity. '
d. You failed to carry out the duties and responsibilities of your position on the afternoon of 25 December 1959 by- not properly maintaining the trouble call log, the daily log sheet, and giving a proper clearance to your relief dispatcher.
e. At no time during the questioning which took place on 25 December 1959, 28 December 1959, and prior to your hearing on 27 January 1960 did you indicate that your failure to properly perform your duties on the afternoon of 25 December 1959 was the result of the after effects of a virus infection.
3. Therefore, in view of the foregoing and in the interest of the service, you are hereby notified of the final decision of this Command to remove you from your position effective at the close of business on * * * 26 February 1960.
4. As a veteran preference employee, you have the right to appeal to the Director, First US. Civil Service Eegion, Boston 9, Massachusetts within ten (10) calendar days after the effective date of this adverse action, as provided by Section 14 of the Veterans’ Preference Act of 1944, as amended. Your appeal to the Commission must be in writing and must set forth your reasons for contesting the adverse action, with offer of proof and such pertinent documents as you are able to submit. You also have the right to appeal to the Secretary of the Navy through the grievance procedure in accordance with rules and time limits specified in NCPI 80. However, an appeal will not be accepted under the grievance procedure if you elect to pursue your right as a veteran preference employe by appealing to the Commission.
5. During the period from receipt of this notice until the effective date of your removal, you will continue to perform duties as assigned by the Head, Utilities Department.
❖ ‡ ❖ ❖ ❖
40. Plaintiff elected to exercise his right as a veteran preference employee and on March 7,1960 filed a written appeal *1132 to the First United States Civil Service Region. The appeal was based upon plaintiff’s contention that the charge which resulted in his removal was not proved and the decision of the commanding officer was contrary to the evidence.
41. The Regional Office of the Civil Service Commission conducted an investigation in the course of which they reviewed copies of pertinent documents and records, including a copy of the transcript of the hearing held by the agency. The Regional Office also obtained affidavits from the individuals who had testified at the hearing, and in addition, obtained an affidavit from McBrayer, who had not been called as a witness at the agency hearing. Most of the affidavits simply stated that their testimony at the agency hearing constituted the full extent of their knowledge in the matter and that they had nothing further to add to such testimony. Colonel Mc-Brayer related in his affidavit his unsuccessful attempt to obtain service or information from the Power Dispatcher’s office on December 25,1959.
42. Upon being advised of the evidence which the First Regional Office of the Civil Service Commission had obtained, plaintiff replied that he had no further documentary evidence to present, but that he did desire a hearing. A hearing was held on May 13,1960, and plaintiff, who was represented by counsel, testified in his own behalf. In addition, some of the witnesses who had testified at the agency hearing also testified at the hearing of the Regional Office of the Civil Service Commission.
43. The findings and recommendations of the First Civil Service Region, with respect to the appeal, were sent to plaintiff by letter dated June 10,1960. The Regional Office found that plaintiff’s removal from his position was accomplished pursuant to the procedural provisions of section 14 of the Veterans’ Preference Act, 58 Stat. 387, 390, as amended, 5 U.S.C. § 863, and part 22 of the Civil Service Commission’s regulations (5 C.F.R.). The findings and recommendations of the Regional Office with respect to plaintiff’s removal were, in pertinent part, as follows:
# # # # *
We have found that procedurally Mr. Harrington’s removal was effected in compliance with the provisions *1133 of Section 14 of the Veterans’ Preference Act of 1944 and Part 22 of the Civil Service Commission’s R« ations. * * *.
On the merits we find from a preponderance of the credible evidence that Mr. Harrington was under the influence of intoxicants while on duty on the afternoon of December 25,1959. We do so on the strength of the testimony of Mr. Springer, Col. McBrayer, Lt. Grundy and Capt. Bennett. It is shown to our complete satisfaction that Mr. Harrington was not in full possession of his faculties on the afternoon in question between 2:00 p.m. and 4:00 p.m., and that he was not able to carry out his normal duties and responsibilities. The only issue about which we find some serious question of fact is whether 'his condition was due to the consumption of alcoholic beverages or to illness not caused by drinking. On this question we find that the weight of the< credible evidence fails to support Mr. Harrington’s claim that his condition was due to illness not connected with drinking. In the first place, we find that such claim was not made until Monday, December 28, when Mr. Harrington was interviewed by Mr. Springer. On the other hand, if it were the fact, it would have been very natural and normal for him to have so stated to Lt. Grundy and Capt. Bennett on December 25, 1959, when they came to the Power Dispatcher’s Office, right before the end of his shift, and to Mr. Springer, when Mr. Springer called Mr. Harrington that evening. Furthermore, if he was feeling progressively poorer as the day went on and knowing the importance of his responsibilities for emergency situations while handling the Power Dispatcher assignment on a holiday, we would expect that Mr. Harrington would have called the Duty Officer* to seek relief before the normal end of his tour. He has not given us a satisfactory explanation for his failure to do so. Secondly, the evidence given by Col. McBrayer and Capt. Bennett relative to their telephone calls, and the testimony Lt. Grundy gave concerning Mr. Harrington’s replies to his questions, and his inability to dial the telephone, which we consider to be worthy of belief, strongly suggests that the behavior of Mr. Harrington more closely resembled that of a person suffering from the effects of alcohol rather than from an illness. We reach the same conclusion from examining the Trouble Log and the Power Dispatcher’s Log. We conclude also that when Mr. *1134 Harrington admitted to having had a couple of drinks it is altogether reasonable for us to infer that Mr. Harrington knew he was being asked if he had been drinking during working hours, and that he was not being asked about any drinks he may have had at 6:00 a.m. or 6:30 a.m., when it was at 4:00 p.m. and 1:00 p.m., at the time of questioning, and the incidents which precipitated the questioning occurred within the two hours preceding 4:00 p.m. Otherwise, again it seems to us only natural and normal that he would then and there have said that he had had two shots of brandy at six o’clock and half past six that morning and no liquor after that. His failure to so state at that time and again on December 28, leads us to conclude that his later statements at the agency hearing and in his appeal to us do not merit credence. In our opinion, they are inconsistent with his statements and acknowl-edgements made on December 25 and 28, as well as with his silence on those dates-as far as consuming any alcoholic beverages in the early morning hours. We also find that when he spoke with Mr. Springer on Monday the 28th, he admitted in substance that he had been drinking on duty, and that' his later disclaimer of his earlier statements does not merit credence.
Mr. Simmons’ testimony concerning his taking of a telephone call or telephone calls while visiting the Power Dispatcher’s Office on the afternoon of the 25th, which we presume was offered for the purpose of showing that perhaps it was Mr. Simmons and not Mr. Harrington who may have handled the telephone calls from Col. McBrayer, leaves us unconvinced. Such a proposition leaves completely unexplained the difficulty which Col. McBrayer, whose testimony we believe, had on the phone unless Mr. Simmons was not in full possession of his faculties, and unable to talk intelligently as reported by Col. McBrayer. There was no evidence presented that Mr. Simmons was in such a condition, whereas there is abundant evidence that Mr. Harrington was.
It was argued at our hearing that the phrase “under the influence of intoxicants” was open to conjecture, and that for the charge to prevail it should be shown that the employee was in effect, grossly drunk. We do not subscribe to such a proposition. In our opinion, the charge has been maintained where, as it is shown here by a preponderance of evidence, Mr. Harrington’s faculties were not functioning normally, and he spoke *1135 and acted as one would be expected to act who was under the influence and where he admitted to having consumed alcoholic beverages. Under the circumstances, we do not find that the failure to have Mr. Harrington undergo any commonly used sobriety tests or examination by a medical authority was a fatal omission. In fact his inability to carry out a direction to dial telephone an Electrician as testified to by Lt. Grundy, showed a lack of physical and mental coordination as effectively as some of the sobriety tests commonly employed.
. The question remaining is whether removal from the service was warranted on the charge and the evidence. The Navy Department’s standard schedule of offenses and penalties in Naval Civilian Personnel Instruction 45 prescribes a range from a reprimand to removal for a first offense of reporting for duty or being on duty under the influence of intoxicants. The extreme penalty was proposed and selected in this case in consideration of the circumstances surrounding the offense and the responsibilities of the position of Power Dispatcher in charge of a watch, at the Naval Base. On the record before us, we cannot say that the Commanding Officer’s decision to remove Mr. Harrington on the charge of being under the influence of intoxicants while on duty on December 25, 1959, ¿s established by the evidence, was arbitrary, capricious or unreasonable, but rather we find that it was warranted, was for such cause as will promote the efficiency of the service within the meaning of Section 14 of the Veterans’ Preference Act of 1944, and is sustained. We do not recommend.any change in the action of the Public Works Center, U.S. Naval Base, Newport, Rhode Island, in effecting Mr. Harrington’s removal.
‡ $ $ $ $
44. The Regional Office advised plaintiff of his right to appeal its decision to the Board of Appeals and Review of the United States Civil Service Commission. Plaintiff filed a timely appeal with the Board of Appeals and Review. Plaintiff’s attorney was advised in a letter dated November 17, 1960, from the Board of Appeals and Review that the decision of the First Regional Office was affirmed, stating, in pertinent part, as follows:
* * * %
* * * As a result of its review, the Board has found, as did the Regional Office, that the current charge is *1136 sustained. The Board also finds that Mr. Harrington’s position required a high degree of alertness to handle emergency situations otherwise it could result in serious damage to life and Government property. The removal action is, therefore, considered warranted and taken for such cause as will promote the efficiency of the service within the meaning of Section 14 of the Veterans’ Preference Act. Accordingly, the Board has found that the decision of the First Regional Office, issued on June 10, 1960, is correct. That decision is therefore affirmed.
45. On January 26,1962, subsequent to removal from his position as a Power Dispatcher, plaintiff was employed by the Boston Naval Shipyard as an electrician, a job in the wage board series.
The proof does not establish plaintiff’s entitlement to recover.
The administrative actions of the agency by which plaintiff was employed and the Civil Service Commission, in connection with plaintiff’s removal, were procedurally sound and are not shown by the record to be arbitrary, capricious or unsupported by substantial evidence.
CONCLUSION OF Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

 Since a judicial review of the administrative record was not requested by either party and a formal trial was held, the court may properly consider the complete record.

 See n. 1, supra.

 There is conflicting testimony in this case. The trial commissioner had full opportunity to face the witnesses and evaluate the testimony offered at the trial.

 This reference is made to testimony of McBrayer that he had previously talked with persons who had no teeth because in his testimony plaintiff stated that he had removed his false teeth about 11:30 a.m. on December 25, 1959, and did not put them back in his mouth until near the time he was to go home on that date.

A certified copy of the agency hearing, complete with exhibits, Is In evidence and contains a certified copy of the Trouble Call Log referred to. Plaintiff admitted that the last three entries on the Trouble Call Log were made by him and the similarity of these last three entries on the Trouble Call Log, as compared with the remaining entries on the Log, made during plaintiff’s tour of duty, is readily apparent.

Or some other supervisor.