**Jess R. ALMEDA et al.**

v.

**The UNITED STATES.**

No. 196–70.

United States Court of Claims.

Jan. 21, 1972.

**1398**

Roger P. Kaplan, Washington, D. C., atty. of record, for plaintiffs.

LeRoy Southmayd, Jr., Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, LARAMORE, Judge, DURFEE, Senior Judge, and DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFFS' AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

LARAMORE, Judge.

This is a civilian pay case brought before the court on the parties' cross-motions for summary judgment. It arises because of a certain welders training course provided to plaintiffs by the defendant in accordance with the Government Employees Training Act, P.L. 85–507, 72 Stat. 327 (1958), 5 U.S.C. §§ 4101–4118 (1970). The issue is whether the several plaintiffs, who attended this training course following the regular 8-hour working day, are entitled to be paid on a regular basis for the total hours spent in that training. We hold that the decision not to pay these plaintiffs for time spent in training was not arbitrary, capricious or contrary to law.

The starting point for this case was when the defendant, through its agents at the Pueblo Army Depot, Pueblo, Colorado, notified plaintiffs herein that because the standards for welding skills and qualifications had changed it would therefore be necessary for all welders employed to be certified. This certification was to be either in Class "A" or Class "B", depending on the level at which the welder was required to perform, and would be granted following successful completion of a test to be given by the defendant. This letter, which was sent September 12, 1966, also notified the plaintiffs that, in order to assist each welder in passing the test and obtaining the certification, a training course would be established at a nearby institution of higher learning. This training course was to be conducted at Southern Colorado State College (SCSC) from September 26, 1966 through March 17, 1967, on Monday, Tuesday and Wednesday of each week, from 5:30 p. m. to 7:30 p. m. There would be no charge to the individual to enroll in said course and, as a matter of fact, each employee was reimbursed for the travel expenses incurred while attending the course. Furthermore, the defendant's agents at Pueblo informed these plaintiffs that if at any time during the progress of the course any person felt he had received adequate training to be certified he could request that the certification test be administered to him and upon successful completion thereof he could terminate his training.

In addition to the above-described general pronouncement of the Maintenance Director for Pueblo, supplemental letters were sent to those welder-employees who chose not to attend the above-described training course. This letter emphasized that certification would be a mandatory requirement as of September 27, 1967 and that while attendance in the training course was not a prerequisite to such certification, it would be very difficult for an average welder to pass the certification test without such training, and without such certification a welder would not be retained in his position as a welder.

In view of the foregoing advice, the lion's share of welders at Pueblo attended the course as offered. (The court has been cited to only one welder who did not attend.) Affidavits show that the time spent in training varied for each individual and ranged from 132 hours at the highest, to 48 hours at the lowest.

Following the completion of the training, plaintiffs applied to the Department of the Army for payment of *overtime*

*pay* based on the hours spent in training after the regular 8-hour day. On July 20, 1967, that application was denied by the Chief, Civilian Personnel Division, Department of the Army. Following that denial, on December 31, 1968, plaintiffs requested payment of overtime wages from the Comptroller General of the United States. Following denial of payment of overtime wages, plaintiffs again requested payment, this time for *regular wages*, from the Department of the Army and ultimately from the Comptroller General. In a letter from the Comptroller General dated February 9, 1970, said request was denied on the basis that the applicable statute does not provide for payment of regular wages in a situation such as this. While this decision may not be, in our view, entirely correct since we are of the opinion that the statute, by its literal terms, *allows* for payment, we nevertheless refuse to overturn the decision of the defendant's agents for reasons hereafter set forth.

The statute to which our attention must be focused is the Government Employees Training Act (GETA), *supra*, and in particular we are concerned with that provision which authorizes the head of an agency to pay or reimburse an employee for time and effort expended during an authorized training period. 5 U.S.C. § 4109 (1970) provides:

§ 4109. Expenses of training.

(a) The head of an agency, under the regulations prescribed under section 4118(a) (8) of this title and from appropriations or other funds available to the agency, may—

(1) pay all or a part of the pay (except overtime, holiday, or night differential pay) of an employee of

the agency selected and assigned for training under this chapter, for the period of training * * *.

It is on this section of the applicable statute that plaintiffs hang their hats in the attempt to convince this court that we should award regular compensation for the time spent in training.

As noted, this section is part of the GETA; another section of that statute authorizes the Civil Service Commission to prescribe regulations to contain the principles, standards and related requirements meant to be accomplished by the act in question. Those regulations, as promulgated to effectuate the policies set forth in Executive Order 11348, 32 Fed.Reg. 6335 (April 22, 1967), appear in 5 C.F.R., Part 410 et seq. (1971). That regulation most important to our case reads as follows:

§ 410.601. Determination of necessary expenses of training.

The head of an agency shall determine which expenses constitute necessary training expenses under section 4109 of title 5, United States Code.

§ 410.602. Prohibition on payment of premium pay.

(a) Except as provided by paragraph (b) of this section, no funds appropriated or otherwise available to an agency may be used for the payment of premium pay to an employee engaged in training by, in, or through Government facilities or non-Government facilities * * *.

■ This Regulation, plus the plain language of the statute itself, together with the declaration of congressional intent, found at H. Report No. 1951, 85th Cong., 2nd Sess., 2 U.S.Code Cong. & Admin.News, page 2928 (1958),[1] clearly

---

1. The Section-by-Section Analysis of the House Report at section 10 provided as follows:

"Section 10 authorizes the head of each department, in accordance with regulations issued by the Civil Service Commission, to use funds appropriated or otherwise available to pay the salary of employees who are being trained (but not to pay them overtime, holiday, or night

differential pay during periods of training). The section also authorizes the department head to cover the necessary expenses of an employee in training either by reimbursing him for those expenses or by providing money in advance in anticipation of such expenses. The necessary expenses include travel; per diem; transportation of family and household goods whenever such expenses would be less than

indicate that the responsible official of the agency where training is being provided through the GETA, has the discretion to pay all or part of the pay of an employee who participates in such training. Even one who has not had the generally unpleasant experience of trying to ferret out the true meaning of a statute could readily detect that the word "may", as used in this statute, was intended to convey the discretionary nature of this statute. With such discretionary guidelines established, it now becomes our task to determine whether or not the head of the agency involved manifestly breached his obligation to carry out the discretionary power conferred upon him by this statute.

■ We must also be cognizant of the long line of cases which have established the principle that in personnel matters such as these we are loath to substitute our judgment for that of the agency unless there is a showing of arbitrary or capricious action by the responsible official. Guiness v. United States, 149 Ct.Cl. 1, cert. denied, 363 U.S. 819, 80 S.Ct. 1257, 4 L.Ed.2d 1517 (1960); Holman v. United States, 181 Ct.Cl. 1, 383 F.2d 411 (1967); Haynes v. United States, 190 Ct.Cl. 9, 418 F.2d 1380 (1969); Camero v. United States, 170 Ct.Cl. 490, 345 F.2d 798 (1965); Dismuke v. United States, 297 U.S. 167, 56 S.Ct. 400, 80 L.Ed. 561 (1936); Sakran v. United States, 176 Ct.Cl. 831 (1966). Thus, in view of the discretionary power of the head of the agency, coupled with the pronounced position of not disturbing a reasonable exercise of that power, it is difficult for these plaintiffs to prevail.

■ From a discussion of the facts by both parties it was learned that attendance at the training program established at SCSC was not a formal requirement. It may be true that for most of these plaintiffs to meet the re-

quirements for certification it was essential that they attend the course. However, attendance at the course was not the sole method by which a welder could pass the certification test and thereby retain his position. Therefore, if we were to hold that the decision not to pay those who attended the course was arbitrary and capricious we would be awarding additional compensation to those welders who chose the training course as a means to achieving the required certification while those who selected alternate means are entitled to nothing. Put another way, such a holding would effectively reward those employees who needed additional training to qualify for the position while discriminating against those who were so qualified that there was no need for further instruction. In our opinion, *that* decision would be arbitrary, not the one actually made.

Furthermore, although there seems to be no authority directly in point on this subject, it is not the first time we have heard the argument that because there was a "tacit expectation" to engage in some extracurricular activity there should also be the concomitant obligation for remuneration. For instance, in Albright, et al. v. United States, 161 Ct.Cl. 356 (1963), the plaintiffs, security guards, were expected, though not ordered, to report early for their duty assignments. In their cry for overtime compensation to this court it was held that such a tacit expectation did not come up to the standards required to enable the plaintiffs to demand overtime compensation under the Federal Employees Pay Act of 1945, 59 Stat. 295, as amended, 68 Stat. 1109 (1954) 5 U.S.C. § 911 (1964). While this case does not arise under that Act and plaintiffs no longer seek overtime compensation, by way of analogy we are of the opinion that in this case the "tacit expectation" does not amount to authorization of ad-

payment of per diem; tuition; matriculation fees; library and laboratory services; purchase or rental of books, materials, and supplies; and other expenses directly re-

lated to the training of such employee. Membership fees are not allowed unless they are directly related to the cost of training."

ditional working hours which would carry with it the obligation for payment of wages. Without such authorization we find no authority for granting plaintiffs' request.

In conclusion, and to reiterate somewhat, it is our opinion that the decision to pay or not to pay was one that was to be made by the head of the agency involved. There can be no doubt that this decision was one to be made by an exercise of that official's discretion. Therefore, unless that decision was arbitrary, capricious or contrary to law, it is not to be disturbed or replaced by a decision of this court. Consequently, since plaintiffs have not shown the court that the decision of the Department of the Army was in violation of the above-described standards we must deny plaintiffs' motion for summary judgment, grant defendant's motion and dismiss plaintiffs' petition.